Christian, J.
This case is before this court for the third time. Uearly forty years have elapsed since the litigation commenced, and the children surviving, who were unborn at the date of the marriage contract (executed in the year 1807), which we are now called upon to construe, are now aged men. It is to be hoped that this appeal will put an end to this *504 protracted litigation, and settle the rights of all the parties finally and forever.
When the case was here in 1872 it involved a mimher of difficult questions concerning the settlement of ^le partnership transactions of Brown, Rives & Co., in which Robert Burton the elder was a partner, also » the accounts of James Brown as executor of Robert Burton the elder, together with the judicial construction of the will of Robert Burton, Jr., and other papers, deeds, and contracts, forming a fruitful source of uncertainty and strife in the courts. The record in that case was composed of two large printed volumes of many hundred pages each. But as numerous as were the questions then brought up and decided by this court, the question now to be determined was not presented in that record, and ivas raised for the first time when the case was sent back to the chancery court for further proper accounts, ordered by the decree of this court to be taken before its commissioner.
The only question we haye now to determine is, what is the true construction to be given to certain provisions of the deed of marriage settlement entered into on the 9th day of October, 1807, between James Brown and Anna P. Burton, his intended wife. These provisions are as follows:
“ And further, in order more effectually to provide for the children of the said marriage, the said James hereby covenants and agrees with the said John P. Braddick, Charles Johnston, Charles J. Macmurdo, that after his just debts there shall be raised out of his estate the sum of ten thousand pounds current money, to be paid in preference to any voluntary disposition of his property, whether by will or otherwise, and placed in the hands of the said trustees, for the purpose aforesaid, and the further purpose of -making *505 a provision for the said Anna P., the said money to be raised as soon as may be done after the decease of the said James Brown, and to be held by them in trust for the issue of said, marriage, if there be any, to be held by them, if there be more than one, as tenants in common, with, benefit of survivorship, and if but one child, then the estate to belong to such child; and in either case the said Anna P. shall be entitled to share the profits of the said ten thousand pounds during her life in the following proportions: that is to say, if there be only one child, she is to receive for life, after the decease of the said Brown, one-third of the said profits for life, and no more; and if there be more than one child, she is in no event to have more than the profits of a child’s part; and if the children of the said marriage should all of them die before attaining the age of twenty-one, then so much of the said sum of ten thousand pounds as shall remain after providing as is herein above set forth for said Anna P., to be disposed of as part of the estate of the said James Brown, in like manner as if provision had not been made for the issue aforesaid; and if there shall be no issue of the said marriage living at the death of the said James Brown, then the said trustees shall pay unto the said Anna P., out of the said profits, the sum of five hundred pounds current money, annually, during her life, and no longer, and. the surplus of the said sum of ten thousand pounds, as well profits as principal, to be and remain a part of the estate of the said James Brown; the said annuity of five hundred pounds to be paid in half-yearly payments.”
Aone of the contingencies mentioned in the foregoing provision ever happened. There was issue of the marriage—seven in number. ISTone of them died before attaining the age of twenty-one years, and all *506 were living at the death of James Brown and- of his wife, Anna Pitfield Brown.
James Brown departed this life in March, 1841, having first made and published his last will and testament, which bears date January 1st, 1841, and was duly admitted to probate and record. His will contains the following "provision:
“Whereas by virtue of a deéd of marriage settlement entered into between myself and my wife, Anna Pitfield Brown, on the 9tli day of October, 1807, in Avhieh I ordered to be raised out of my estate the sum of ten thousand pounds currency, in preference to any voluntary-disposition of my property, whether by will or otherwise, and held for her use, &c., &c., which deed not having been recorded may be held as annulled agreeable to the laws of this commonwealth; now, in pursuance of said deed, be it here distinctly understood, I will and devise the same by this writing to be put in full power and force, and now fully confirm the same.”
Looking to these provisions of the deed of marriage settlement and the will of James Brown, which “ confirms and puts in full power and force ” said deed in all respects, we have now to declare what is the true construction to be given to the words found in said deed “ to be held by them, if more than one, as tenants in common, with benefit of survivorship.” In solving this question the controlling, if not only legitimate enquiry is, what was the intention of the grantor and testator, James Brown, in the use of these words ? In ascertaining that intention,- we cannot rely upon any fixed course of construction founded upon arbitrary rules and technical principles; but that intention is best deduced.from the terms and provisions of both the deed of marriage settlement and the will of James Brown, viewed in the light of the circumstances which *507 attended the execution of these two instruments. In this case we may look not only to the deed of marriage settlement, hut to the will of James Brown; indeed, we must look to both, to aid us in the interpretation of the true intention of the grantor and testator, because the deed of settlement being recognized and reaffirmed in the will, is as much a part of the will itself, so far as the provisions we are considering are concerned, as if it was literally and entirely incorporated therein.
In seeking for the true interpretation of the language used, we are not tied down to the literal words, however technical and of whatever established legal signification they may be, when read abstractly in a single phrase; but must read them and interpret them in their relation to other terms and provisions of the instrument in which they occur. The subject matter of the contract, the general purpose and object pf the contracting parties, or of the testator, shown by the instrument itself, has always been considered a just foundation for giving the words of an instrument an interpretation, when considered relatively, different from that which they would receive in the abstract. The provisions of the whole writing taken together, and showing the general design and purpose to be accomplished, is a just medium of interpretation of the language and meaning of the pai’ties in relation to it. 1 Greenl. Ev. §§ 286, 287, and cases there cited.
The great object being to discover the intention, the court may put itself in the place of the parties, and then see how the terms of the instrument affect the property or subject matter.
Applying these rules of interpretation to the case before us, and looking first to the deed of marriage settlement, we discover that it is the declared purpose of that instrument—first, to secure to Mrs. Burton, whom *508 lie was about to marry, her separate estate, and second, to provide for the issue of the marriage. This purpose is plainly declared in the first clause of the deed in distinct and unequivocal terms, as follows: “Whereas a marriage is shortly intended to be solemnized between the said James Brown arid Anna P. Burton, now this indenture witnesseth, that for and in consideration of the premises, and for and in consideration of the sum of one dollar by the said John P. Braddick, Charles Johnston, and Charles J. Maemurdo, to the said James Brown in hand paid, the receipt whereof is hereby acknowledged, and with a view to secure to the said Anna P. Burton her separate property and to provide for the issue of said marriage,” &c., &c. After securing to Mrs. Burton her separate estate, the deed provides : “ And further, in order more effectually to provide for the children of the marriage ,* * * * there shall be raised out of his estate the sum of ten thousand pounds, current money, to be paid in preference to any voluntary disposition of his property, by will or otherwise, and placed in the hands of said trustees for the purpose aforesaid, * * * to be held by them in trust for the issue of saidmarriage.” How, up to this time there cannot be a doubt, nor is there a word that can raise a doubt, that the plain intention of James Brown was to provide for the issue of the marriage, for all and not a part; to provide for all his children alike, and not alone for that child which might happen to be the last survivor of them all. Such intention is plain from the very terms of the deed up to the point where it uses the words “ to be held by them, if there be more than one, as tenants in common, xoith benefit of survivorship.” How far the use of these w'ords upon the true interpretation to be given them will control and affect thé plainly declared purpose and object of the deed will be-considered presently.
*509 K"ow, leaving for a moment the deed of marriage settlement, and looking to the will of James Brown, we find that after the payment of debts and legacies he devises the whole of his estate, real and personal, to his seven children, to be equally divided between them. It will thus be seen that both in the deed of settlement in the provisions above quoted, and by the will of the testator, equality of distribution among his children, and not inequality, was fully declared as the purpose and object of both instruments. It is true that the rights of the children were fixed by the marriage settlement, and could not be affected by the will of James Brown; but we refer to the will as well as to the deed to show that on the part of James Brown, at least, (the grantor and testator,) equality of distribution among his children, and not inequality, was his declared intention and fixed purpose.
But it is insisted by the learned counsel for the appelpellant that the words “ to be held by them as tenants in common, with benefit of survivorship,” are the all-controlling words in this contract; that these words are of plain legal signification and iixed meaning by judicial construction, and that they determine the rights of James Brown’s children, and the nature and extent of the estate they take under the marriage contract. He insists that by the use of these words James Brown intended that his children should enjoy in equal shares the profits of the fund (ten thousand pounds) to be raised for them, and as each died the profits were to be divided among those remaining, until finally the sole survivor would succeed to the whole fund.
This construction, so at variance with the declared purpose of the grantor to provide for his issue, and w'hich would at some indefinite period give the whole fund to the last survivor of unborn children, without any provision for the families of those who had died, can only be *510 given in a case so plain as to compel the court to adopt it, by some rigid and arbitrary rule of law, from which there is no escape or evasion.
To maintain his position the learned counsel for the appellant relies upon certain English cases, and affirms •that at the date of the deed of settlement (1807) the words used by the grantor, “ tenants in common with benefit of survivorship,” had a fixed legal signification, established by the decisions of the English courts, and aré capable of but' one construction, and that is, that when such words are used the period of distribution, that is, the period at which the fund absolutely vests, is the death of all the donees except the last survivor, and cannot be referred to the death of the testator or grantor, or to any other particular event. In other words, his construction of this provision is, that upon the death of James Brown his children took under the marriage settlement a vested interest in the fund liable to be divested by dying, not being the longest liver of all. According to his contention, all the children had a vested equal interest in the profits of the fund, and each a contingent interest in the whole fund dependent upon his or her being the longest liver of them all.
An examination of the English cases will show that certainly as far back as 3807, when this deed of marriage settlement was executed, there was no such uniform and unvarying rule of construction of the words “ with benefit of survivorship,” or words of like import, established by the English courts. On the contrary, the cases on the subject were conflicting and seemingly irreconcilable.
This conflict of opinion has been noticed and commented upon in two cases in this court. See Hansford v. Elliott, 9 Leigh, 79; and Martin, adm'r, v. Kirby, adm’r, 11 Gratt. 69.
• In the former case, Judge Parker delivering the opinion of the court, after reference to many of the English *511 cases, was of opinion that the weight of authority in the English courts was in favor of the doctrine that the period of survivorship, where a different intent was not plainly manifested, should be referred to the death of the testator. He was of opinion that the cases which affirmed a contrary doctrine wore easy to be reconciled upon the special circumstances of those cases. This case was decided in 1827. In Martin, adm’r, v. Kirby, adm’r, 11 Gratt. p. 67, Judge Lee, in referring to Judge Parker’s opinion, says he does not concur with Judge Parker that the preponderance of the English authorities are in favor of the rule making- the words of the survivorship relate to the period of the testator’s death. He says the cases are directly conflicting and irreconcilable, and remarks that “in the earlier cases, almost without an exception, it will be found that the words of survivorship have been held to refer to the period of the testator’s death” (and he cites a number of cases). On the other hand, numerous cases are to be found affirming a different rule, and referring the words of survivorship to the death of the tenant for life, or other prior particular estate; and he cites a number of eases affirming this view. Vide cases cited, p. 68, many of which are the same cited in argument here. He then observes that whatever might be the safest and soundest rule of construction, and that best adapted to promote the intention of the testator, the preponderance of the English authorities is now in favor of the rule making the words of survivorship relate to the expiration of the previous particular estate, to the period of the distribution of the subject of the gift, rather than to the death of the testator. But Judge Lee, after expressing this opinion, differing from Judge Parker, as to the preponderance of the English cases, immediately adds: “ But it may admit of very grave question whether this is a subject upon which anything like a fixed rule of construction can be established. The question, and the *512 only legitimate enquiry, is, what is the intention of the testator.” ’
A careful examination of the English cases has convinced me that the English courts have established no such fixed and invariable rule of construction as that insisted upon by the learned counsel for the appellant.
Even in the English cases which hold that the period of suvivorship relates to the period of distribution, and not to the death of the testator, the general rule is always controlled by the special intent shown by the whole instrument.
It is impossible in the limits of an opinion to pass in review all the English eases on this subject, and it is sufficient to say, after careful examination, that they do not establish any such fixed and uniform rule as that contended for.
But there is a ease decided by Lord Alvanley, just a few years before the deed of marriage settlement wre are considering was executed, and reported in 3 Ves. R. 450, which gives to the words “ with benefit of survivorship ” a very different construction from that contended for by the appellant’s counsel. It is the case of Maberly v. Strode, and was decided just fifty years after the case of Haws v. Haws, and thirty years after the case of Rose v. Hill, so much relied on by the appellants’ counsel as establishing the rule contended for. In that case the clause for construction in the testator’s will was as follows: “But in case my son shall die unmarried and without issue, * * * * then and in such case in trust to assign and transfer the principal of such funds and securities unto my nephews, "William and James Strode, in equal proportions, share and share alike, (his, her, and their issue, or the issue of either of them, to take their parents’ share,) with benefit of survivorship to my said nepheios and, niece.” Upon the construction of these words (the same words used in the deed of settlement *513 before us) it was held that “-words of survivorship added to a tenancy in common, in a will, are to be applied to the death of. the testator unless an intention to postpone the vesting is apparent.” It is instructive to read Lord Alvaubfs opinion in this case, as showing the conflict of views on this question at that time, only a few years before the execution of the marriage contract before us, and as settling, by his opinion, that there was no arbitrary rule of construction which gave to these words, “ with benefit of survivorship,” a fixed legal signification. At the expense of protracting this opinion beyond a reasonable length, I cannot refrain from giving an extract from his opinion, as it is a case exactly in point.
He says (p. 455): “The other question (i. e. the question to what period the words of survivorship relate) admits of more doubt; but in the opinion I have formed upon the words of survivorship I found myself upon what I thought myself warranted to do in Perry v. Woods (ante 204), when I had occasion to look into all the authorities, and I relied upon Stringer v. Phillips, followed by Roebuck v. Dean, which is almost exactly the present case; and there the lord chancellor thought himself warranted to follow Stringer v. Phillips. All the cases were considered in Perry v. Woods; and Brograve v. Winder, 2 Ves. R. 634, was urged as an authority that the lord chancellor had changed his opinion. I have looked into these cases, rather wishing to found my opinion upon them. Roebuck v. Dean is as near this case as can be. Lord Bindon v. Lord Suffolk seems, as the lord chancellor said, to have had a very odd fate in the house of lords. Considering Stringer v. Phillips, recognized by Lord Sardwick, his lordship thought it safer to adhere to that. It is very true in Brograve v. Winder he was of opinion the words were such as plainly proved the vesting was postponed ; he gives his reasons, but does not retract what *514 he said in Roebuck v. Dean, but founds himself upon the words—from which it plainly appeared that the time of distribution was the time to which the words were meant to apply. I followed that (Roebuck v. Dean) and Stringer v. Phillips in Perry v. Woods. This case is very nearly the same as these, perhaps stronger.” After this reference to the authorities, Lord Alvanley concludes as follows (and we may adopt his language in this case): “Upon these authorities, I am of the opinion that upon these blind words (‘ with benefit of survivorship,’ the same used in the case before us)—upon these blind loords, the safest and soundest construction, best warranted by the authorities, most beneficial to the parties, most likely to be that intended, is that the meaning is, such as shall survive the testator, and that it is not meant that it should remain in contingency, and vest only in such as should happen to survive the son, with the chance of the whole being lost and a total intestacy occasioned.”
This case was decided in 1797, just ten years before the marriage contract was executed, and is the last English case I can find before 1807. This case is in utter repugnance to the doctrine contended for here by the appellant’s counsel. See also Stringer v. Phillips, 1 Eq. Ca. Ab. 293; and specially Roebuck v. Dean, 2 Ves. R. 265. In that ease testatrix gave stock to trustees in trust to pay dividends to her niece for life, and after her decease that the stock should be equally divided among the brother and four sisters of the testatrix, and in like manner to the survivors or survivor of them. This was declared to be a tenancy in common between those alive at the death of the niece and the representatives of such as died i.n her lifetime.
It is proper to remark before passing from the English authorities, that in the case of Haws v. Haws, so much relied on as establishing the rule contended for, the lord chancellor said this case stands on its own cir *515 cumstances, divested of all authorities, yet consistent with all.
I have thus considered at length the English cases because they were relied on as establishing the rule of construction of the words-used: “with benefit of survivor-ship.” "While there is no case in this court in which this precise question has arisen, or these words have been construed, yet the doctrine of this court on the general subject of the survivorship has been clearly affirmed in several decisions, which are opposed to any rule which refers the period of survivorship to an indefinite period, when the last survivor only shall be living, as the period for the enjoyment of the fund. See Hansford v. Elliott, 9 Leigh, 79; Martin, adm’r, v. Kirby, 11 Gratt. 67; Stone’s ex’or v. Nicholson, 27 Gratt. 1, and cases cited in opinions of Judges Parker and Lee.
JBoth upon principle and authority I am of opinion that the words in the marriage settlement before us do not limit the enjoyment of the fund to the last survivors of the children of James Brown, but that they refer to the death of Mrs. Brown. Those who succeeded her took an equal interest in the fund. • Upon a fair and legal construction of the words of survivorship, the period of distribution relates to the death of Mrs. Brown, and not to the death of all the donees save the last survivor.
I would fix that period at the death of Mrs. Brown rather than to the death of the grantor, James Brown, because the fund was not to be created until after the death of Brown, and after the payment of all his debts and legacies; and for the further reason that during the life of Mrs. Brown she is entitled to a certain portion-of the profits of said fund contingent upon the number of children that might be the fruit of the marriage. I would, therefore, fix the period to which the words of survivorship relate at the death of Mrs. Brown, and not the death of the testator. Practically, it can make no *516 difference in the decree of the’ court below, inasmuch as the children all survived both James Brown and his widow. The effect will be the same whether the period of distribution be referred to the death of James Brown or to that of Mrs. Brown.
The construction which w'e have given to the marriage settlement is that which is fully warranted by the authorities, and which carries into effect the plain meaning and intention of the parties, without resorting to the unusual and unnatural interpretation which presupposes an intention to give the whole fund at an indefinite period, it may be nearly a century afterwards, to the longest liver of the unborn children of a prospective marriage. Upon the whole case, I am of opinion that there is no error in the decree of the chancery court, and that the same be affirmed.
The other judges concurred in the opinion of Christian,, J.
Decree affirmed.